**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

**JENNY M. HIGH,**

      **Plaintiff,**

   **v.**
                                        **Civil Action No. 3:21cv81**

**WELLS FARGO BANK,**

      **Defendant.**

### MEMORANDUM OPINION

This matter comes before the Court on Defendant Wells Fargo Bank's ("Wells Fargo") Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(6)[1] (the "Motion").  (ECF No. 33.)  Plaintiff Jenny M. High responded, (ECF No. 34), and Wells Fargo replied, (ECF No. 35).  Accordingly, this matter is ripe for disposition.  The Court dispenses with oral argument because the materials before it adequately present the facts and legal contentions, and argument would not aid the decisional process.  The Court exercises jurisdiction pursuant to 28 U.S.C. § 1331.[2]  For the reasons that follow, the Court will grant Wells Fargo's Motion to Dismiss in its entirety.

---

[1] Rule 12(b)(6) allows dismissal for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).

[2] "The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."  28 U.S.C. § 1331.  The Complaint alleges that Wells Fargo violated High's rights pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2 ("Title VII"), and the Civil Rights Act of 1866, 42 U.S.C. § 1981(a) ("Section 1981").  (ECF No. 5 ¶¶ 33–40.)

## I.  Factual and Procedural Background[3]

This employment action arises out of Wells Fargo's alleged discrimination against Jenny

M. High based on her ethnicity and national origin, and subsequently retaliating against her for

activities allegedly protected by Title VII, 42 U.S.C. § 2000e-2,[4] and Section 1981.[5] ( ECF No. 5

¶¶ 33–40.)  High claims that Wells Fargo discriminated against her based on her Hispanic

ethnicity and Dominican national origin by subjecting her to a hostile work environment,

constructively discharging her, and retaliating against her.  (ECF No. 5 ¶¶ 33–40.)

### A.    Factual Background

In January 2004, High started her employment with Wells Fargo as a Help Desk

Associate.  (ECF No. 5 ¶ 10.)  Later, she was promoted to the position of Systems Support

Analyst in Wells Fargo's Enterprise Information Technology Group earning approximately

$108,000 per year, plus benefits.  (ECF No. 5 ¶ 10.)  From 2004 to 2017, High routinely received

satisfactory to superior performance evaluations from her managers. (ECF No. 5 ¶ 11.)

---

[3] For the purpose of the Rule 12(b)(6) Motion to Dismiss, the Court will accept the well-pleaded factual allegations in High's Amended Complaint, (ECF No. 5), as true and draw all reasonable inferences in favor of High.  *See Kensington Volunteer Fire Dep't, Inc. v. Montgomery Cty., Md.*, 684 F.3d 462, 467 (4th Cir. 2012) ("a court 'must accept as true all of the factual allegations contained in the complaint' and 'draw all reasonable inferences in favor of the plaintiff.'") (quoting *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011)).

[4] Title VII prohibits employers from "discriminat[ing] against any individual with respect to his [or her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, . . .or national origin."  42 U.S.C. § 2000e-2(a)(1).

[5] 42 U.S.C. § 1981(a) sets forth that "[a]ll persons within the jurisdiction of the United States shall have the same right . . . to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefits of all laws and proceedings for the security of persons and property."  The Supreme Court held in *CBOCS West, Inc. v. Humphries* that § 1981 encompasses claims of retaliation.  553 U.S. 442 (2008).

On or about June 8, 2017, during a conference call that included system support analysts from across the United States, Paul Salmela, a leader of another team, made a comment about Mexicans, specifically asking how many Mexicans were needed to change a lightbulb. (ECF No. 5 ¶ 12.) High interpreted the comment as a slur against Mexicans, indicating that they "were lazy and exhibited . . . poor work ethic." (ECF No. 5 ¶ 12.) High alleges that the comment created an extremely hostile work environment for her because she is a woman of Hispanic ethnicity and Dominican national origin. (ECF No. 5 ¶ 13.) After "various members of her team complained," Salmela apologized to her and the team via email. (ECF No. 5 ¶ 14.)

Around March 2018, Wells Fargo reorganized the IT Group and placed High on the same team as Salmela. (ECF No. 5 ¶ 15.) Distressed about her placement, High spoke to Larry Cullinan, a manager on her new team, and requested placement on a different team. (ECF No. 5 ¶ 16.) Cullinan refused and "responded that she needed to let go of her concern and anxiety." (ECF No. 5 ¶ 16.) On or about March 12, 2018, High sent an email to Cullinan to address her concerns regarding "Paul Salmela's racist comments." (ECF No. 5 ¶17.) In her email, High wrote, in relevant part:

> I understand that you will never understand what it feels like to be discriminated against, and in your opinion, since it only happened one time I should get over it. I have to learn to work with him, we all do, because you have. Larry I refuse to become a victim at the place I love to work. I know a lot of good people Paul has victimized including myself, and you do as well. The racist comment was the last straw that broke this camel's back, for you it may have been one time for me it was the last time. You advised me that someone filed a complaint against Paul regarding the racist comment and he was remorseful, you handled it, and me filing another complaint would probably be bounced back to you and end with the same results. I am very disappointed with that response. You asked me what do I want the outcome to be? I wanted you to protect the people you are being paid to protect, be a manager. I did what it tells in the Wells Fargo required trainings to do, we all did, and you are complacent. . . .

(ECF No. 5 ¶ 17.)

3

Two days later, on or about March 14, 2018, without receiving a response from Cullinan, High talked to Tim Starr, another team manager, and sent him a copy of the same email. (ECF No. 5 ¶ 18.) Starr told High that he had forwarded her email to William Piper, his superior, who purportedly forwarded the email to Wells Fargo's Human Resources Department ("Human Resources") to initiate an investigation. (ECF No. 5 ¶ 18.) High later learned that none of her complaints had been forwarded to Human Resources. (ECF No. 5 ¶ 25.)

Around May 2018, High "developed problems with her work-provided laptop computer that hindered her ability to perform assignments." (ECF No. 5 ¶ 21.) While waiting for a computer, High received several complaints regarding her "supposed failure to work." (ECF No. 5 ¶ 21.) During the same month, High's supervisors began to assign her "'tickets,' which were generated when Wells Fargo employees requested assistance with computer hardware, software[,] and network issues." (ECF No. 5 ¶ 22.) These "ticket" tasks were a "low-level function of systems supports analysts" that High had not performed "since her earliest days with Wells Fargo." (ECF No. 5 ¶ 22.) High's supervisors imposed the ticket assignments on top of her normal volume of assignments. (ECF No. 5 ¶ 22.) High's supervisors also began to accuse her of not completing assignments that she had in fact completed. (ECF No. 5 ¶ 22.) Finally, "someone in the IT team sabotaged . . . High's work by not renewing the access she need[ed] to complete assignments." (ECF No. 5 ¶ 23.)

Around June 13, 2018, High submitted a complaint directly to Human Resources regarding Salmela's June 2017 "joke." (ECF No. 5 ¶ 25.) Her complaint included names of witnesses on the conference call, but Human Resources contacted neither High nor the witnesses. (ECF No. 5 ¶ 25.) High subsequently sent "numerous" emails to Piper regarding the matter, but she did not receive a response from him. (ECF No. 5 ¶ 26.)

In late June 2018, "Wells Fargo scheduled a retreat" for High's Enterprise IT Group of system analysts in St. Louis, Missouri. (ECF No. 5 ¶ 27.) During the second day of the retreat, High attended a meeting that included Cullinan, Salmela, and another manager named Joseph Dillon. (ECF No. 5 ¶ 27.) At the meeting, the three managers "accused . . . High of not working[ and] lying about her laptop computer malfunctioning," and they "claimed that she never notified the help desk that it needed repair." (ECF No. 5 ¶ 27.) Cullinan, Salmela, and Dillon also said that High was "incompetent in her job duties and needed to be demoted to the help desk" and that she was "lazy and clueless about her job responsibilities." (ECF No. 5 ¶ 28.) High then "developed a sudden migraine headache and began rapidly hyperventilating." (ECF No. 5 ¶¶ 28–29.) Although the conversation stopped when William Piper entered the room, High felt as if "the three men had a choke hold around her neck, flooding her mind with flashing memories of abuse suffered in a prior violent relationship." (ECF No. 5 ¶ 29.) She felt as if she were having "a heart attack and requested an ambulance." (ECF No. 5 ¶ 29.) She later discovered that she had suffered a panic attack. (ECF No. 5 ¶ 29.)

Soon after, on approximately July 1, 2018, High's physician placed her on a medical leave of absence. (ECF No. 5 ¶ 30.) Over one year later, "[i]n or about October 2019, . . . High's long-term disability benefits [ended] because" Wells Fargo failed to make "insurance premium payments [for her] to the company administering [its] disability benefit plan." (ECF No. 5 ¶ 31.) "This prompted Wells Fargo to terminate . . . High's employment on October 18, 2019." (ECF No. 5 ¶ 31.)

As redress, High requests that the Court reinstate her to her former position. (ECF No. 5 ¶¶ 36, 40.) High also seeks "(a) [compensation for] loss of past and future earnings, including fringe benefits; (b) compensation for her humiliation, severe pain and suffering,

emotional distress, and loss of personal and professional reputation; (c) compensation for damage to her career; (d) punitive damages; (e) attorney's fees under 42 U.S.C. § 1988; and (f) costs of suit." (ECF No. 5 ¶¶ 36, 40.)

**B.    Procedural Background**

On June 14, 2018, High filed an administrative Charge of Discrimination with the United States Equal Employment Opportunity Commission ("EEOC"), alleging "disparate treatment on the basis of her sex (equal pay), . . .a hostile work environment on the basis of her national origin (Hispanic/Dominican), and retaliate[ion] against her for engaging in a protected activity (complaining of a hostile work environment when transferred to work with [Salmela]." (ECF No. 5 ¶ 5.) The EEOC then transferred High's charge to the Office of the Attorney General of Virginia, Division of Human Rights. (ECF No. 5 ¶ 5.) On December 3, 2019, the Division of Human Rights issued a determination finding "no reasonable cause to believe that Wells Fargo discriminated or retaliated against" High. (ECF No. 5 ¶ 6.) "High received a Dismissal and Notice of Rights from the EEOC dated January 16, 2020, allowing her 90 days to commence suit in court." (ECF No. 5 ¶ 6.)

On February 24, 2020, High, appearing *pro se*, initiated her first case against Wells Fargo in this Court (the "February 2020 Case"). (Case No. 3:20cv121, ECF No. 1.) On April 13, 2020, the Court dismissed the February 2020 Case without prejudice for failure to prosecute because High failed to file an Amended Complaint per the Court's March 10, 2020 Order. (Case No. 3:20cv121, ECF No. 5.) On February 12, 2021, and with the assistance of counsel, High filed a second case against Wells Fargo, the instant action, before this Court. (ECF No. 1.) On the same day, she filed an Amended Complaint in the February 2020 Case. (Case No. 3:20cv121, ECF No. 9.) On February 17, 2021, per this Court's Order, (ECF No. 4), the

6

Clerk filed the Amended Complaint from the February 2020 Case as the initial Complaint in this action, (ECF No. 5).

The Amended Complaint brings four claims, as follows:

**Count I:**   Wells Fargo subjected High to a hostile work environment and constructively discharged her employment based on her Hispanic ethnicity and Dominican national origin in violation of Title VII;

**Count II:**   Wells Fargo subjected High to a hostile work environment and constructively discharged her employment based on her Hispanic ancestral and ethnic characteristics and her Dominican national origin in violation of Section 1981;

**Count III:**   Wells Fargo retaliated against High by constructively discharging her employment for engaging in protected activity when she complained of ethnicity and national origin discrimination in violation of Title VII;

**Count IV:[6]**   Wells Fargo retaliated against High by constructively discharging her employment for engaging in protected activity when she complained of ancestral, ethnicity, and national origin discrimination in violation of § 1981.

(ECF No. 5 ¶¶ 33, 35, 37, 39.)

On April 5, 2021, Wells Fargo filed a Motion to Dismiss. (ECF No. 10.)  High responded, (ECF No. 20), and Wells Fargo replied, (ECF No. 22).  On June 21, 2021, the Court granted the Motion to Dismiss and dismissed the instant action with prejudice.  (ECF Nos. 23, 24.)

On July 6, 2021, High filed a Motion to Alter Judgment.  (ECF No. 25.)  In her Motion to Alter Judgment, High stated that "the Court's [June 21, 2021] Order and Memorandum Opinion addressed only [her] national origin discrimination and retaliation claims under Title VII . . . (Counts I and III), but did not address [her] national origin discrimination and retaliation claims

---

[6] The Amended Complaint mistakenly labels this "Count VI." (ECF No. 5, at 11.)  The Court will refer to this as Count IV given that it is the fourth and final count alleged in the Amended Complaint.

7

brought under [Section] 1981 . . . (Counts II and IV).  (ECF No. 25, at 1.)  Accordingly, High

asked the Court to "vacate the portion of its Order that dismissed the national origin

discrimination and retaliation claims under 42 U.S.C. § 1981 until it ha[d] addressed Wells

Fargo's Motion to Dismiss those claims."  (ECF No. 25, at 1.)

On March 25, 2022, the Court granted the Motion to Alter Judgment, vacating the portion

of its June 21, 2021 Order "dismissing [High's] claims brought pursuant to [Section] 1981" and

ordering " the parties to file new briefing regarding the claims brought pursuant to

[Section] 1981." (ECF No. 28, at 2.)  Thus, Counts II and IV of High's Amended Complaint

remain pending before this Court.

Wells Fargo subsequently filed its Motion to Dismiss Counts II and IV of High's

Amended Complaint.  (ECF No. 33.)  High responded, (ECF No. 34), and Wells Fargo replied,

(ECF No. 35).  For the reasons that follow, the Court will grant the Motion to Dismiss Counts II

and IV without prejudice.

## II.  Standard of Review:  Rule 12(b)(6)

"A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint;

importantly, it does not resolve contests surrounding the facts, the merits of a claim, or the

applicability of defenses." *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir.

1992) (citing 5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1356

(1990)).  To survive Rule 12(b)(6) scrutiny, a complaint must contain sufficient factual

information to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*,

550 U.S. 544, 570 (2007); *see also* Fed. R. Civ. P. 8(a)(2) ("A pleading that states a claim for

relief must contain . . . a short and plain statement of the claim showing that the pleader is

entitled to relief.").  Mere "labels and conclusions" declaring that the plaintiff is entitled to relief

are not enough. *Twombly*, 550 U.S. at 555. Thus, "naked assertions of wrongdoing necessitate some factual enhancement within the complaint to cross the line between possibility and plausibility of entitlement to relief." *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (quoting *Twombly*, 550 U.S. at 557) (internal quotation marks omitted).

A complaint achieves facial plausibility when the facts contained therein support a reasonable inference that the defendant is liable for the misconduct alleged. *See Twombly*, 550 U.S. at 556; *see also Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009). This analysis is context-specific and requires "the reviewing court to draw on its judicial experience and common sense." *Francis*, 588 F.3d at 193 (citation omitted). The court must assume all well-pleaded factual allegations to be true and determine whether, viewed in the light most favorable to the plaintiff, they "plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679; *see also Kensington*, 684 F.3d at 467 (finding that the court in deciding a Rule 12(b)(6) motion to dismiss "'must accept as true all of the factual allegations contained in the complaint' and 'draw all reasonable inferences in favor of the plaintiff'" (quoting *Kolon Indus.*, 637 F.3d at 440)). This principle applies only to factual allegations; however, and "a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 679.

### III. Analysis

In her Amended Complaint, High does not adequately allege facts supporting her Count II hostile work environment and constructive discharge claims or her Count IV retaliatory discharge claim brought under Section 1981. Consequently, the Court will grant Wells Fargo's Motion to Dismiss and dismiss the Amended Complaint without prejudice.

A.    **Allegations in the Amended Complaint**

Before turning to the legal analysis, the Court clarifies the approach it must take toward the allegations before it.   First, in addition to the hostile work environment claim, it must treat Count II as a constructive discharge claim, not one for intentional discrimination.   Second, High's assertion of a constructive discharge contains a fatal flaw:  her employment was terminated; she did not resign.

In its Memorandum of Law in Support of Defendant's Motion to Dismiss, Wells Fargo submits that "Count II attempts to state claims for hostile work environment and intentional discrimination based on Plaintiff's ethnicity and national origin."  (ECF No. 32, at 2.)  In doing so, Wells Fargo misconstrues High's claim in Count II.  The plain language of High's Amended Complaint shows that, in addition to hostile work environment, High alleges constructive discharge, not intentional discrimination.  (ECF No. 5 ¶ 35 ("By subjecting . . .High to a hostile work environment and constructively discharging her employment on the basis of [ethnic characteristics and national origin] . . . .")  High rightly notes this error in her Memorandum in Opposition to Defendant's Motion to Dismiss.  (ECF No. 34, at 10 (arguing that Wells Fargo "misconstrues . . . High's claim, which is that she was constructively discharged."))  Accordingly, the Court construes Count II as asserting Section 1981 hostile work environment and constructive discharge claims, and will analyze it as such.

Second, High alleges inconsistent theories in her Amended Complaint.  In each count, she alleges that she was constructively discharged by Wells Fargo.  But she also alleges that Wells Fargo *terminated* her employment on October 18, 2019, after it terminated her long-term disability benefits "because of Wells Fargo's nonpayment of insurance premium payments to the company administering Wells Fargo's disability benefit plan."  (ECF No. 5 ¶ 31.)

10

**B.      Section 1981's Statute of Limitations and Application to this Case**

In a previous opinion in this matter, this Court dismissed Counts I and III of High's Amended Complaint because she had failed to file her claims within Title VII's statute of limitations. *See High v. Wells Fargo Bank*, Case No. 3:21cv81, 2021 WL 2530980 (E.D. Va. June 21, 2021). Title VII has a 90-day statute of limitations, which had expired by the time High filed her lawsuit in this Court. *See id.* at *5–6.

However, High brings Counts II and IV pursuant to Section 1981. (ECF No. 5 ¶¶ 35, 39.) In Count II, she alleges a hostile work environment claim and a constructive discharge claim. (ECF No. 5 ¶ 35.) "A four-year statute of limitations applies to hostile work environment claims," *Ruffin v. Anthem, Inc.*, Case No. 2:21cv251, 2022 WL 4451328, at *5 (E.D. Va. Sept. 23, 2022) (citing *Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 223 (4th Cir. 2016)), and constructive discharge claims under Section 1981, *see Crawford v. Newport News Indus. Corp.*, 2018 WL 4524124, at *3 (E.D. Va. Feb. 26, 2018) (citing *Jones v. R.R. Donnelly & Sons, Co.*, 541 U.S. 369, 382 (2004)). In Count IV, High alleges a retaliatory discharge claim under Section 1981. (ECF No. 5 ¶ 39.) Section 1981's four-year statute of limitations also applies to retaliatory discharge claims brought pursuant to that statute. *See id.* (citing *Jones*, 541 U.S. at 382, and *White v. BFI Waste Servs., LLC*, 375 F.3d 288 (4th Cir. 2009)).

The pertinent conduct in this case began on or about June 8, 2017, when Salmela made the derogatory "joke," (ECF No. 5 ¶ 12), and ended with Wells Fargo's termination of High's employment on October 18, 2019, (ECF No. 5 ¶ 31). High filed this lawsuit on February 12, 2021, (ECF No. 1), and filed her Amended Complaint on February 17, 2021, (ECF No. 5), all within the four-year statute of limitations for her claims in Counts II and IV.

**C.    The Relationship Between Ethnicity and National Origin Under Section 1981 and Application to This Case**

In her Amended Complaint, High alleges discrimination "based on her Hispanic ancestral and ethnic characteristics and her Dominican national origin" in violation of Section 1981. (ECF No. 5 ¶ 35.) Although the text of Section 1981 only speaks explicitly to race, *see* 42 U.S.C. § 1981(a) ("All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws . . . as is enjoyed by white citizens."), its "concept of 'race' is much broader than our modern understanding of the term" and includes ancestral and ethnic characteristics. *Nnadozie v. Genesis HealthCare Corp.*, 730 F. App'x 151, 156 (4th Cir. 2018) (citing *Saint Francis Coll. v. Al-Khazraji*, 481 U.S. 604, 609–613 (1987)) ("As the Supreme Court detailed in *Saint Francis College*, in light of the legislative history of Section 1981 and prevailing mid-19th century notions about race, it is clear that 'Congress intended to protect from discrimination identifiable classes of persons who are subjected to intentional discrimination solely because of their *ancestry or ethnic characteristics*.'").

"Still, the scope of Section 1981 protection is not unlimited," and there exists a distinction between "discrimination based on ancestry or ethnic characteristics and discrimination based on place or nation of . . . origin." *Id.* at 157. However, there is no bright line. *See id.* "Trying to draw clear distinctions between someone's ethnicity and national origin can often amount to impossible hairsplitting," and "[i]n some instances, evidence of discrimination based on national origin may even be 'identical as a factual matter' to discrimination based on ethnicity or ancestry." *Id.*

Even reading High's Amended Complaint favorably, it is possible that there is no difference between "her Hispanic ancestral and ethnic characteristics and her Dominican national

12

origin[,]" (ECF No. 5 ¶ 35), such that this Court could draw a distinction between her ethnicity and national origin. That is, in this case, it is possible that "evidence of discrimination based on national origin may even be 'identical as a factual matter' to discrimination based on ethnicity or ancestry." *Nnadozie*, 730 F.App'x at 157.The Court nonetheless evaluates High's case with both concepts in mind.

### D. Because High Does Not Adequately State Hostile Work Environment or Constructive Discharge Claims under Section 1981, the Court Will Grant the Motion to Dismiss as to Count II

The Court will grant the Motion to Dismiss High's hostile work environment and constructive discharge claims brought under Section 1981 in Count II. High fails to state a Section 1981 hostile work environment claim because she fails to satisfy the "severe or pervasive" element required of that claim. *Nnadozie*, 730 F.App'x at 158. Likewise, High fails to properly allege a Section 1981 constructive discharge claim because she does not state that she resigned from her employment with Wells Fargo. She plainly states that Wells Fargo terminated her employment. Even if the Court were to treat her claim as one for constructive discharge, that, too, would falter.

### 1. Legal Standard: Hostile Work Environment Claim Under Section 1981

A hostile work environment "is one that is 'permeated with discriminatory intimidation, ridicule, and insult . . . that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Nnadozie*, 730 F. App'x at 158 (4th Cir. 2018) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). The United States Court of Appeals for the Fourth Circuit has delineated four elements a plaintiff must show to prevail in a Section 1981 hostile work environment claim: "(1) unwelcome conduct; (2) that is based on the plaintiff's [protected status]; (3) which is sufficiently severe or pervasive to alter

the plaintiff's conditions of employment and to create an abusive work environment; and (4)

which is imputable to the employer." *Id.* (quoting *Boyer-Liberto v. Fontainebleau Corp.*, 786

F.3d 264, 277 (4th Cir. 2015) (en banc)); *see also Chapman v. Oakland Living Ctr.*, 48 F.4th

222, 229 (4th Cir. 2022) (citing *Boyer-Liberto*, 786 F.3d at 277) ("The elements of a hostile work

environment claim are the same under Title VII and . . . [Section] 1981."). Here, the parties

present argument only as to whether High has satisfied the third element.

To establish the third element, a plaintiff "must show that a reasonable jury could find

that the [protected status-based] harassment was so severe or pervasive as to alter the conditions

of [his or her] employment and create an abusive or hostile atmosphere." *Perkins v. Int'l Paper

Co.*, 936 F.3d 196, 208 (4th Cir. 2019) (internal quotation marks and citation omitted). This

element "has both a subjective and objective component." *Id.* (citation omitted). That is, at this

stage, a plaintiff must allege sufficient facts to show that he or she "did perceive, and a

reasonable person would perceive, the environment to be abusive or hostile." *Id.* (citation

omitted). In determining whether harassing conduct qualifies as severe or pervasive, the Fourth

Circuit has instructed that courts "must look at all the circumstances, including the frequency of

the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a

mere offensive utterance; and whether it unreasonably interferes with an employee's work

performance." *Id.* (citation omitted).

The plaintiff "must clear a high bar in order to satisfy the . . . severe or pervasive test."

*Id.* (citation omitted). To demonstrate that a defendant's behavior was "objectively severe and

pervasive at the motion to dismiss stage, [the plaintiff] must allege sufficient facts plausibly

demonstrating that the workplace was 'permeated with discriminatory intimidation, ridicule and

insult that is sufficiently severe or pervasive to alter the conditions of the [plaintiff's]

14

employment and create an abusive working environment.'" *Jones v. Sun Pharm. Indus., Inc.,*

No. 3:19cv566, 2020 WL 2501439, at *6 (E.D. Va. May 14, 2020) (quoting *Mustafa v. Iancu,*

313 F. Supp. 3d 684, 695 (E.D. Va. 2018)); *see also Spruill v. Kip Killmon's Tysons Ford, Inc.,*

No. 1:12cv806, 2012 WL 4829339, at *3 (E.D. Va. Oct. 10, 2012) (quoting *Peary v. Gross,* 365

F.Supp.2d 713, 728 (E.D. Va. 2005)) ("Generally, 'incidents must be more than episodic; they

must be sufficiently continuous and concerted in order to be deemed pervasive.'").  Indeed,

"[s]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not

amount to discriminatory changes in the terms and conditions of employment." *Perkins,* 936

F.3d at 208 (quoting *Faragher v. City of Boca Raton,* 524 U.S. 775, 788 (1998)).  Even

"[i]ncidents that would objectively give rise to bruised or wounded feelings will not . . . satisfy

the severe or pervasive standard." *Id.* (quoting *E.E.O.C. v. Sunbelt Rentals, Inc.,* 521 F.3d 306,

315 (4th Cir. 2008)).  For example, "[r]ude treatment by [coworkers], callous behavior by [one's]

superiors, or a routine difference of opinion and personality conflict with [one's] supervisor, are

not actionable under" Section 1981.  *Id.* (second, third, and fourth alterations in original)

(quoting *Sunbelt Rentals,* 521 F.3d at 315–16).

> **2.      High Does Not State a Section 1981 Hostile Work Environment Claim Because the Offending Conduct Was Not So Severe or Pervasive as to Alter Her Conditions of Employment and Create an Abusive Work Environment**

In her Amended Complaint, High alleges that:  first, a June 2017 derogatory "joke"

regarding Mexican people (made by a leader of another team who subsequently apologized);[7]

---

[7] To be sure, High places on the record an email she sent to Cullinan saying, in part:

> I know a lot of good people Paul has victimized including myself, and you do as
> well. The racist comment was the last straw that broke this camel's back, for you it
> may have been one time for me it was the last time. You advised me that someone
> filed a complaint against Paul regarding the racist comment and he was remorseful,

second, her complaints about discrimination and request for transfer were ignored; third, that she

was accused of failing to work after developing problems with her laptop; fourth, that she was

assigned additional low-level assignments on top of her ordinary tasks in retaliation for reporting

the "joke;" fifth, that her work was sabotaged when the "access" needed for her to complete her

assignments was not renewed; and sixth, that, at a retreat with other Wells Fargo employees, she

was accused of incompetence and laziness and was unable to defend herself, which she claims

created a hostile work environment for her. [8]  Even reading her Amended Complaint favorably,

however, High's allegations fail to state a hostile work environment claim under Section 1981.

In particular, High fails to plead conduct so "severe or pervasive [as] to alter [her]

conditions of employment and to create an abusive work environment." *Nnadozie*, 730 F. App'x

at 158 (citation omitted).  That is, considering "all the circumstances, including the frequency of

---

you handled it, and me filing another complaint would probably be bounced back
to you and end with the same results. I am very disappointed with that response.

(ECF No. 5 ¶ 17.)
     This vague mention of additional conduct, even though made contemporaneous to the
events under scrutiny here, are too conclusory to consider as part of the alleged pervasive
environment High challenges.  Moreover, this email confirms that Cullinan, the supervisor on
her new team, took *some* action against Salmela for making the "joke." High's disappointment as
to the outcome of the first response, or for his refusal to raise the issue a second time, does not
rise to a cognizable  hostile work environment claim.

[8] For instance, in Paragraph 24 of her Amended Complaint, High lists other Wells Fargo
conduct, including "the deprivation of system access, piling on of low-level ticket work[,] and
charges of incomplete assignments."  (ECF No. 5 ¶ 24.)  However, this conduct simply does not
constitute "severe or pervasive" conduct sufficient to support a hostile work environment claim.
*See Nnadozie*, 730 F. App'x at 158.  Indeed, courts in this District, and across the Fourth Circuit
more broadly, "routinely dismiss[] hostile work environment claims based on far more
egregious" conduct.  *Mustafa*, 313 F. Supp. 3d at 696 (citing cases); *see also Short v. Berryhill*,
Case No. ELH-18-2714, 2019 WL 4643806, at *17 (D. Md. Sept. 24, 2019) (stating that "[t]he
alleged conduct [in that case] consist[ed] primarily of[, among other things] negative job
evaluations," that "[c]ourts have declined to find a hostile work environment based on workplace
conduct far more egregious than what was alleged," and that these allegations did "not amount to
severe or pervasive harassment that can support a hostile work environment claim").

the . . . conduct [at issue]; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance," High fails to satisfy the third element of a Section 1981 hostile work environment claim, and thus her claim must fail. *Perkins*, 936 F.3d at 208.

First, High's claim stems largely from Salmela's June 2017 offensive "joke." (*See* ECF No. 5 ¶¶ 12–19, 25.)  A single episode of a racially offensive "joke" within an over-two-year period is insufficiently frequent to support a finding that High has satisfied the third element of a Section 1981 hostile work environment claim. *See Salley v. Sch. Bd. of Amelia Cnty.*, Case No. 3:20cv939, 2021 WL 5760893, at *16 (E.D. Va. Dec. 3, 2021) (citing *Sonnier v. Diamond Healthcare Corp.*, 114 F. Supp. 3d 349, 357 (E.D. Va. 2015)) (finding that allegations of "eight incidents of race-based harassment over a three-year period . . . is insufficiently frequent to pass muster); *Roberts v. Fairfax Cnty. Pub. Schs.*, 858 F. Supp. 2d 605, 610 (E.D. Va. 2012) (quoting *Schwapp v. Town of Avon*, 118 F.3d 106, 110–11 (2d Cir. 1997)) ("In the context of racial slurs, 'there must be more than a few isolated incidents of racial enmity, meaning that instead of sporadic racial slurs, there must be a steady barrage of opprobrious racial comments.'"); *Irani v. Palmetto Health*, 767 F. App'x 399, 417 (4th Cir. 2017) (citing *Faragher*, 524 U.S. at 788) (stating that "while the comments made in th[at] case [were] odious, there [was] no evidence to suggest that the infrequent comments—two comments over an 18 month period— were so severe or pervasive as to be actionable").

Second, High adds other events, but addresses them in just one sentence of her Memorandum in Opposition to Wells Fargo's Motion to Dismiss.  Even there, High avers only that "she was subjected to a hostile work environment initially through the derogatory joke . . . , followed by Wells Fargo's refusal to investigate her claims of hostility or address her requested

17

transfer to another IT team."[9]  (ECF No. 34, at 4.)  That is, High posits a hostile work

environment existed because of the June 2017 "joke" *and* due to Wells Fargo's disregard for her

claims of hostility and her transfer request.  But, based on the facts alleged, disregard for claims

of hostility cannot support a hostile work environment claim, *see Anthony v. Alexandria City*

*Pub. Schs.*, Case No. 1:22cv107, 2022 WL 2541914, at \*7–8 (E.D. Va. July 7, 2022) (explaining

that the plaintiff alleged that the defendant created a hostile work environment by, among other

things, ignoring her complaints, but finding that the defendant's treatment of the plaintiff was

"more akin to a 'personality conflict' . . . resulting in incidents that [gave] 'rise to bruised or

wounded feelings'" and thus, that it could not support her hostile work environment claim);

*Campbell v. Sch. Dist. of Chester Cnty.*, Case No. 0:09–411–CMC–PJG, 2010 WL 5600905,

at \*7 (D.S.C. Dec. 20, 2010) (finding that the plaintiff had "failed to establish a *prima facie* case

of a hostile work environment" when the conduct "she characterize[d] as harassment include[d]

the defendant's ignoring her complaints" and stating that "[t]his conduct simply [did] not rise to

---

[9] In her argument, High omits the facts from her Amended Complaint that she was accused of failing to work after developing problems with her laptop, that she was assigned additional low-level assignments on top of her ordinary tasks in retaliation for reporting the "joke," that her work was sabotaged when the "access" needed for her to complete her assignments was not renewed, and that, at a retreat with other Wells Fargo employees, she was accused of incompetence and laziness and was unable to defend herself, which she claims created a hostile work environment for her.

However, even considering these additional allegations, the Court cannot find that High has stated a hostile work environment claim. *See, e.g., Berryhill*, 2019 WL 4643806, at \*17 (explaining that employer action including negative performance evaluations did "not amount to severe or pervasive harassment that can support a hostile work environment claim"); *Abror v. Dep't of Labor & Indus. Office of Vocational Rehabilitation*, Case No. 1:17-cv-02221, 2019 WL 2716087, at \*5 (M.D. Pa. June 28, 2019) (citing cases and finding that the plaintiff had not stated a claim for constructive discharge when, among numerous other allegations, his "workload was increased despite his failure to complete previous assignments"); *see also Chan v. NYU Downtown Hosp.*, Case No. 03 Civ. 3003, 2006 WL 345853, at \*10 (S.D.N.Y. Feb. 14, 2006) (internal quotation marks omitted) (citation omitted) (stating in the constructive discharge context that the "[p]laintiff's dissatisfaction with her salary and work assignments, nor her allegations that [the d]efendants ignored her complaints, nor the slights of co-workers and supervisors can be said to have made her job objectively intolerable.").

the level required by law to establish a hostile work environment"), and nor can the denial of a

transfer request, *see Brady v. Bd. of Educ. of Prince George's Cnty.*, 222 F. Supp. 3d 459, 473

(D. Md. 2016) (citing *Thorn v. Sebelius,* 766 F.Supp.2d 585, 601 (D. Md. 2011), *aff'd* 465 F.

App'x 274 (4th Cir. 2012) ("[A]llegations of harassment[,] including denial of transfer requests .

. . fail[] to establish a claim of retaliatory hostile work environment, and instead "amount[] to

instances where [the plaintiff] disagreed with the management style or decisions of those who

supervise[] him" or her.)

Moreover, "the Amended Complaint fails to allege how" Wells Fargo's disregard for

High's claims of hostility and her transfer request "was *because of* her" ethnic characteristics or

national origin. *Anthony*, 2022 WL 2541914, at *7 (citing cases); *see also Innocenti v.*

*WakeMed*, Case No. 5:18-CV-90-FL, 2019 WL 3683606, at *6 (E.D.N.C. Aug. 6, 2019) (finding

that the plaintiff had failed to sufficiently allege that the defendant acted on the basis of the

plaintiff's national origin when the "plaintiff . . . failed to even allege a bare temporal connection

between [the] defendant's alleged retaliatory conduct and [the] plaintiff's complaints about

mistreatment of Hispanic employees"). Without showing a causal connection between Wells

Fargo's conduct and High's ethnic characteristics or national origin, these allegations cannot

support High's hostile work environment claim. *See Anthony*, 2022 WL 2541914, at *7

(citing cases).

Third, High does not plead sufficient facts indicating that the June 2017 "joke" and

subsequent inaction were *severe* enough to support her hostile work environment claim. *See*

*Salley*, 2021 WL 5760893, at *17; *see also Berryhill*, 2019 WL 4643806, at *17 (citing cases)

(stating that "[t]he alleged conduct [in that case] consist[ed] primarily of[, among other things]

negative job evaluations," that "[c]ourts have declined to find a hostile work environment based

19

on workplace conduct far more egregious than what was alleged," and that these allegations did
"not amount to severe or pervasive harassment that can support a hostile work environment
claim"). Courts in this District, and across the Fourth Circuit more broadly, "have routinely
dismissed hostile work environment claims based on far more egregious comments." *Mustafa*,
313 F. Supp. 3d at 696 (citing cases); *see, e.g.*, *Whitfield v. DPL Wilson Med. Ctr., LLC*, 482 F.
Supp. 3d 485, 492 (E.D.N.C. 2020) (finding allegations that the plaintiff had been "referred to as
'black Christel' an unspecified number of times" (to differentiate her from a white employee
named Crystal) and additional even more blatantly offensive epithets that occurred during a six
month period insufficient to satisfy the third element of a hostile work environment claim). *Cf.*
*White*, 375 F.3d at 297 (stating that the plaintiff alleged that "throughout his employment . . . ,
supervisors repeatedly called him and other [B]lack employees" many especially offensive
epithets, the most mild of which included "boy, . . . porch monkey, . . . and Zulu Warrior,"
and finding that this conduct satisfied the third element of the plaintiff's hostile work
environment claim).

Fourth, High's allegations regarding the June 2017 "joke" "cannot reasonably be
described as . . . physically threatening or humiliating" such that they would support a hostile
work environment claim. *Perkins*, 936 F.3d at 209.

Finally, High does not plausibly allege that the June 2017 "joke" "unreasonably
interfere[d] with [her] work performance." *Id.* at 208 (quoting *Sunbelt Rentals*, 521 F.3d at 315).
Indeed, she pleads no facts indicating that the "joke" "interfere[d] with [her] work performance"
at all. *Id.* Instead, she asserts that beginning in May 2018, *computer problems* "hindered her
ability to complete assignments," (ECF No. 5 ¶ 21), that her supervisors assigned her low-skill
so-called "tickets" on top of her normal workload, (ECF No. 5 ¶ 22), and that "someone in the IT

team sabotaged . . . [her] work by not renewing the access she need[ed] to complete assignments," (ECF No. 5 ¶ 23). Even taking all of these allegations as true, High fails to state a hostile work environment claim.

Thus, consideration of all the circumstances surrounding the June 2017 "joke" and other actions reveal that they do not satisfy the "severe or pervasive" element of a Section 1981 hostile work environment claim as to her ethnic characteristics or national origin. *See Nnadozie*, 730 F. App'x at 158. Accordingly, High's Count II hostile work environment claim brought under Section 1981 must fail.

### 3.   Legal Standard:  Constructive Discharge Under Section 1981

"Although hostile work environment claims are assessed under a 'severe and pervasive' standard, constructive discharge claims are evaluated under an objective 'intolerability' standard, requiring a plaintiff to prove 'circumstances of discrimination so intolerable that a reasonable person would resign.'" *Nnadozie*, 730 F. App'x 151 at 162 (quoting *EEOC v. Consol Energy, Inc.*, 860 F.3d 131, 144 (4th Cir. 2017)). To state a claim for constructive discharge, a plaintiff must meet a "high standard," *Ofoche v. Apogee Med. Grp., Va., P.C.*, 815 F. App'x 690, 692 (4th Cir. 2020) (citing *Amirmokri v. Balt. Gas & Elec. Co.*, 60 F.3d 1126, 1133 (4th Cir. 1995)). *Cf. Green v. Brennan*, 578 U.S. 547, 555 (2016) (citing *Pa. State Police v. Suders*, 542 U.S. 129 (2004)) ("When the employee resigns in the face of such circumstances, [the law] treats that resignation as tantamount to an actual discharge.").[10] Indeed, "[t]he 'intolerability' standard governing constructive discharge claims is more stringent than the 'severe and pervasive'

---

[10] In *Green*, the Supreme Court of the United States addressed constructive discharge in the context of a Title VII claim. *See* 578 U.S. at 555. The law applies here, of course, because "Title VII and [Section] 1981 claims are governed by the same standard." *Rodriguez v. Elon Univ.*, 751 F. App'x 395, 397 n.* (4th Cir. 2018) (citing *Guessous*, 828 F.3d at 216).

standard for hostile work environment claims." *Nnadozie*, 730 F. App'x 151 at 162 (citing *Amirmokri*, 60 F.3d at 1133).

Specifically, a plaintiff must satisfy two elements. *Perkins*, 936 F.3d at 211–12; *Green*, 578 U.S. at 555. "First, a plaintiff must show that his [or her] 'working conditions became so intolerable that a reasonable person in the employee's position would have felt compelled to resign.'" *Perkins*, 936 F.3d at 212 (quoting *Green*, 578 U.S. at 555); *see also Nnadozie*, 730 F. App'x 151 at 162. This element "is assessed by the objective standard of whether a reasonable person in the employee's position would have felt *compelled* to resign, . . . that is, whether he [or she] would have had *no choice* but to resign." *Perkins*, 936 F.3d at 212 (internal quotation marks and citations omitted). "Critically, difficult or unpleasant working conditions and denial of management positions, without more, are not so intolerable as to compel a reasonable person to resign." *Id.* (citing cases).

Second, "a plaintiff must [show that she] actually resign[ed] because of those conditions." *Id.* Specifically, the plaintiff must allege that but for those conditions, he or she would not have resigned. *See Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 140 S. Ct. 1009, 1014 (2020).

### 4.   High Does Not State a Section 1981 Constructive Discharge Claim Because She Does Not Allege that She Resigned and She Does Not Allege Objectively Intolerable Working Conditions

Even reading High's Amended Complaint favorably, she does not state facts sufficient to state a claim for constructive discharge under Section 1981. In particular, she does not allege facts sufficient to satisfy either element of a Section 1981 constructive discharge claim.

Crucially, High fails to allege that she resigned from her position at Wells Fargo, and therefore, she does not satisfy the second element of a Section 1981 constructive discharge claim. *See Perkins*, 936 F.3d at 212. She instead states, multiple times, that Wells Fargo

terminated her employment.  (ECF No. 5, at 2, ¶ 31.)  Although High appears to contend that her medical leave constituted a constructive discharge, this argument fails because taking medical leave does not amount to a resignation.  *See, e.g., Clehm v. BAE Sys. Ordinance Sys., Inc.*, 291 F. Supp. 3d 775, 791 (W.D. Va. 2017) (quoting *Green*, 578 U.S. at 555) (indicating that although the plaintiff took an extended, medically-necessary leave of absence, doing so did not support her constructive discharge claim because she did not actually resign), *aff'd* 786 F. App'x 391 (4th Cir. 2019).  Consequently, her constructive discharge claim cannot succeed.

In addition, even if High had alleged that she resigned, she does not articulate the necessary facts to show objectively intolerable working conditions as required by the first element of a constructive discharge claim.  *See Perkins*, 936 F.3d at 212; *see also Evans v. Int'l Paper Co.*, Case No. 3:16cv01215-JMC, 2018 WL 1558870, at *11 (D.S.C. Mar. 31, 2018) (citation omitted) ("[B]ecause the [C]ourt finds that Plaintiff cannot satisfy the elements of a hostile work environment claim, which is a necessary predicate to establishing a hostile-environment constructive discharge claim, Plaintiff's hostile-environment constructive discharge claim necessarily fails."), *aff'd* 936 F.3d 183 (4th Cir. 2019); *Nnadozie*, 730 F. App'x 151 at 162 ("[B]ecause [Plaintiff] cannot maintain a hostile work environment claim, the district court properly dismissed her claims of constructive discharge.").  To begin, even viewed favorably, Wells Fargo's alleged disregard of High's complaints of discrimination did not create objectively intolerable working conditions.  *See Morgan v. Central Baptist Church of Oak Ridge*, Case No. 3:11cv124-TAV-CCS, 2013 WL 12043468, at *16 (E.D. Tenn. Dec. 5, 2013) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006), and citing *Akers v. Alvey*, 338 F.3d 491, 499 (6th Cir. 2003)) ("An employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take

place at work and that all employees experience"); *see also Chan*, 2006 WL 345853, at *10 (internal quotation marks omitted) (citation omitted) ("Plaintiff's dissatisfaction with her salary and work assignments, nor her allegations that Defendants ignored her complaints, nor the slights of co-workers and supervisors can be said to have made her job objectively intolerable."). Nor did the addition of "tickets" to High's workload because an increase in workload of that sort is insufficient to support a claim for constructive discharge.[11] *See, e.g., Abror*, 2019 WL 2716087, at *4–5 (citing cases and finding that the plaintiff had not stated a claim for constructive discharge when, among numerous other allegations, his "workload was increased despite his failure to complete previous assignments").

Further, even Cullinan, Salmela, and Dillon's conduct at the June 2018 retreat is insufficient to adequately support High's constructive discharge claim. *See Salley*, 2021 WL 5760893, at *13 (citing *Perkins*, 936 F.3d at 212) (finding that the plaintiff had not stated a claim for constructive discharge even though supervisors had confronted her in front of her colleagues, passed over her for promotions, and, in her view, "subjected [her] to . . . unfounded criticism"); *see also Berryhill*, 2019 WL 4643806, at *17 (explaining that employer action including negative performance evaluations did "not amount to severe or pervasive harassment that can support a hostile work environment claim"). Indeed, considering the allegations contained in High's Amended Complaint as a whole, they are less troubling than the conduct alleged in other

---

[11] And, even reading High's Amended Complaint favorably, the fact that the addition of the "tickets" may have appeared to be a demotion is insufficient—even if the Court were to treat the "ticket" assignments as a demotion, it would not be a demotion sufficient to establish a constructive discharge claim based on High's allegations. *See United States ex rel. Bachert v. Triple Canopy, Inc.*, 321 F. Supp. 3d 613, 622 (E.D. Va. 2018) (quoting *Carter v. Ball*, 33 F.3d 450, 459 (4th Cir. 1994)) (stating that "[d]emotion can constitute a constructive discharge," but indicating that the circumstances must be much more serious than those alleged in that case).

cases in which this Court, and other courts in this District, have determined that the plaintiff did not satisfy the first element of a constructive discharge claim. *See, e.g., Salley,* 2021 WL 5760893, at *13–14; *Burke v. CHS Middle East LLC,* Case No. 1:18-cv-01605-LO-JFA, 2019 WL 459022, at *6 (E.D. Va. Feb. 4, 2019).

Thus, High's Amended Complaint fails to plead facts sufficient to support either element of a constructive discharge claim under Section 1981. Accordingly, her Count II constructive discharge claim must fail.

### E. Because High Does Not Plead Facts Sufficient to Support a Section 1981 Retaliatory Discharge Claim, the Court Will Grant the Motion to Dismiss as to Count IV

The Court will also grant Wells Fargo's Motion to Dismiss as to High's Count IV retaliatory discharge claim. High fails state a claim for retaliatory discharge under Section 1981 because she alleges no constructive discharge; she alleges termination of her employment. She also does not plausibly illustrate a causal connection between her October 2019 termination and the earlier complaints she lodged, the conversations and emails regarding the June 2017 "joke;" and the assignment of low-level job duties.

### 1. Legal Standard: Retaliatory Discharge Under Section 1981

To succeed on a claim for retaliatory discharge under Section 1981, a plaintiff must prove three elements: "(1) [that she] engaged in protected activity[;] (2) [that she] suffered an adverse employment action at the hands of [her employer]; and[,] (3) [that the employer] took the adverse action because of the protected activity." *Jacques v. Wipro Ltd.,* Case No. 3:20cv865, 2021 WL 1270467, at *8 (E.D. Va. Apr. 6, 2021) (quoting *Bryant v. Aiken Reg'l Med. Ctrs. Inc.,* 333 F.3d 536, 543 (4th Cir. 2003)); *see also Nnadozie,* 730 F. App'x at 160 (citing *Guessous,* 828 F.3d at 217, for the proposition that "elements to establish *prima facie* claim of

retaliation under Title VII and Section 1981 are identical" and for the elements of a retaliation claim). Neither party disputes that High engaged in protected activity. Thus, only the second and third elements remain at issue.

As to the second element, "[a]dverse employment actions are those that negatively impact the terms, conditions, or benefits of employment." *Ainsworth v. Loudoun Cnty. Sch. Bd.*, 851 F. Supp. 2d 963, 976 (E.D. Va. 2012) (citing *Payne v. Fairfax Cnty.*, No. 1:05cv1446, 2006 WL 3196545, at \*4 (E.D. Va. Nov. 1, 2006). Relevant to High's claims, constructive discharge constitutes an adverse employment action. *See Ofoche*, 815 F. App'x at 692. So, too, would termination. *See Ainsworth*, 851 F. Supp. at 976 (citing *Yashenko v. Harrah's N.C. Casino Co.*, 446 F.3d 541, 551 (4th Cir. 2006)).

As to the third element, a plaintiff must demonstrate a causal connection between the protected activity and the adverse employment action. *See Jacques*, 2021 WL 1270467, at \*9 (citing cases). The Fourth Circuit and courts in this District have recognized that the plaintiff may establish this causal connection by "show[ing] that [the employer] had knowledge of the protected activity and that the temporal proximity between the employer's knowledge of protected activity and the discharge was 'very close.'"[12] *Bullard v. Panasonic Corp. of N. Am.*, 418 F. Supp. 2d 802, 814 (E.D. Va. 2006) (quoting *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001), and citing *Shields v. Fed. Express Corp.*, 120 F. App'x 956, 962 (4th Cir. 2005)); *see also Jacques*, 2021 WL 1270467, at \*9 (citing *Breeden*, 532 U.S. at 273) ("To show a causal connection . . . , [the p]laintiff may show that the adverse action came in close proximity

---

[12] The Fourth Circuit has not "adopted a bright temporal line" regarding which lengths of time satisfy the temporal proximity aspect. *Perry v. Kappos*, 489 F. App'x 637, 643 (4th Cir. 2012). However, it has "held that a three- or four-month lapse between the protected activities and discharge was 'too long to establish a causal connection by temporal proximity.'" *Id.* (quoting *Pascual v. Lowe's Home Ctrs., Inc.*, 193 F. App'x 229, 233 (4th Cir. 2006)).

to the protected activity engaged in by [the p]laintiff and that the protected activity preceded the adverse employment action."); *id.* (citing *Carter v. Ball*, 33 F.3d 450, 460 (4th Cir. 1994)) ("stating that an employee's discharge 'soon after the employee engages in protected activity is strongly suggestive of retaliatory motive and thus indirect proof of causation'"). However, "[w]here the time between the events is too great to establish causation based . . . on temporal proximity, [the] plaintiff must present 'other relevant evidence . . . to establish causation,' such as 'continuing retaliatory conduct and animus' in the intervening period." *Perry*, 489 F. App'x at 643 (fourth alteration in original) (quoting *Lettieri v. Equant Inc.*, 478 F.3d 640, 650 (4th Cir. 2007)).

> **2.    High Does Not State a Claim for Retaliatory Discharge Under Section 1981 Because She Does Not Properly Allege Facts Indicating That Wells Fargo Constructively Discharged Her or That Wells Fargo Took an Adverse Action Because of Her Protected Activity**

In Count IV, High avers that by constructively discharging her, Wells Fargo also retaliatorily discharged her in violation of Section 1981.[13]  (ECF No. 5 ¶ 39.)  Like High's Count II claim, however, this claim must also fail.

---

[13] In Paragraph 24 of her Amended Complaint, High also declares that "the deprivation of system access, piling on of low-level ticket work[,] and charges of incomplete assignments were materially[ ]adverse actions . . . taken in retaliation for complaining of the hostile work environment."  (ECF No. 5 ¶ 24.)

However, Count IV of her Amended Complaint specifically refers only to her constructive discharge allegation, (ECF No. 5 ¶ 39), and nowhere in her Response to Wells Fargo's Motion to Dismiss does she make any arguments that "the deprivation of system access, piling on of low-level ticket work[,] and charges of incomplete assignments were materially[ ]adverse actions . . . taken in retaliation for complaining of the hostile work environment," (ECF No. 5 ¶ 24).  The Court will not interpret Paragraph 24 of the Amended Complaint as adding to her retaliatory discharge allegation in Count IV.  However, even if High had included Paragraph 24's allegations within Count IV, she would still fail to state a claim for retaliatory discharge under Section 1981.

To begin, as this Court has already determined, High has not stated a claim for constructive discharge[14] under Section 1981. Thus, she has not pleaded facts sufficient to satisfy the second element of a retaliatory discharge claim, and her claim cannot succeed. *See Jacques*, 2021 WL 1270467, at *8 (citation omitted).

In addition, even if she had satisfied the second element, High has not stated facts demonstrating a causal connection between her protected activity and the alleged adverse employment action. *See Jacques*, 2021 WL 1270467, at *9 (citing cases). For one thing, the length of time between High's complaints, conversations, and emails regarding Salmela's offensive "joke" and her termination is too attenuated to enable the Court to infer a causal connection based on temporal proximity. *See Bullard*, 418 F. Supp. 2d at 814 (citing cases); *Jacques*, 2021 WL 1270467, at *9 (citing cases).

High's complaints, conversations, and emails raising her concerns occurred over a four-month period between March 2018 and June 2018, (ECF No. 5 ¶¶ 16–18, 25–26), and Wells Fargo terminated her employment in October 2019, (ECF No. 5 ¶ 31). She makes clear that she received long-term disability benefits for a full year before Wells Fargo terminated her employment. (ECF No. 5 ¶ 30.) A period of over one year between the alleged protected activity and adverse employment action is far "too long to establish a causal connection by temporal proximity." *Perry*, 489 F. App'x at 643 (quoting *Pascual*, 193 F. App'x at 233). Further, High does not plead facts sufficient to illustrate "continuing retaliatory conduct and animus in the intervening period."[15] *Id.* (internal quotation marks omitted) (quoting *Lettieri*, 478

---

[14] Again, the Court addresses the constructive discharge claim to make a complete record. High does not articulate a constructive discharge because her employment was terminated.

[15] High, at most, alleges only one incident—the late June 2018 encounter between her and three managers—that occurred shortly after her final instance of protected activity (a series

F.3d at 650).  She does not add any other facts in her Amended Complaint that would enable the Court to infer a causal connection between her complaints, conversations, and emails about Salmela's joke and her subsequent termination.  Indeed, multiple times in her Amended Complaint, High submits that Wells Fargo terminated her employment for reasons completely unrelated to her protected activity.  (ECF No. 5, at 2, ¶ 31.)  Specifically, she contends that Wells Fargo failed to make "insurance premium payments [for her] to the company administering [its] disability benefit plan," thus ending High's long-term disability benefits and prompting her termination.[16]  (ECF No. 5 ¶ 31.)  At base, because High's Amended Complaint illustrates no causal connection between her alleged protected activity and adverse employment action, her § 1981 retaliatory discharge claim cannot succeed.  *See Jacques*, 2021 WL 1270467, at *9 (citing cases).

Because High has neither stated a claim for constructive discharge nor demonstrated a causal connection between her conversations, emails, and complaints about Salmela's "joke,"

---

of emails sent to Piper "regarding discrimination, retaliation[,] and harassment").  (ECF No. 5 ¶ 26.)  Even reading High's Amended Complaint favorably, this additional episode cannot establish "continuing retaliatory conduct and animus in the intervening period" between her protected activity and her alleged constructive discharge.  *Perry*, 489 F. App'x at 643 (internal quotation marks omitted) (quoting *Lettieri*, 478 F.3d at 650).

[16] High does not address whether other employees' long-term disability benefits were terminated due to Wells Fargo's failure to pay premiums.  However, even assuming Wells Fargo only failed to pay *her* premium, and continued to pay other employees' premiums, this would not enable High to state a claim for retaliatory discharge.  Critically, as previously discussed, a period of over one year between the alleged protected activity and adverse employment action is far "too long to establish a causal connection by temporal proximity."  *Perry*, 489 F. App'x at 643 (quoting *Pascual*, 193 F. App'x at 233).  And, High does not illustrate "continuing retaliatory conduct and animus in the intervening period."  *Id.* (internal quotation marks omitted) (quoting *Lettieri*, 478 F.3d at 650).  Her disability payments occurred throughout that intervening time frame.

subsequent events, and her subsequent termination, her Section 1981 retaliatory discharge claim in Count IV must fail. *See Jacques*, 2021 WL 1270467, at \*8 (citation omitted).

Because Counts II and IV, which are dismissed in this Opinion, and Counts I and III, which were dismissed in the Court's June 6, 2021 Opinion, comprise all of High's claims in this matter, this Opinion and the accompanying Final Order constitute a full dismissal of this matter.

## IV. Conclusion

For the foregoing reasons, the Court will grant the Motion to Dismiss. (ECF No. 33.) The Court will dismiss High's Amended Complaint without prejudice. (ECF No. 5.)

An appropriate Order shall issue.

Date: 3-14-2023
Richmond, Virginia

_____ /s/

M. Hannah Lauck
United States District Judge